FILED
JOHN J. ...........HY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO** 03 SEP -5 PH 2:28
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ERIC WRIGHT** | : | **Case No. C-1-02-508** |
| | : | |
| **Plaintiff,** | : | **Judge Susan J. Dlott** |
| | : | |
| **v.** | : | |
| | : | **PLAINTIFF'S MEMORANDUM** |
| **HOBSONS, INC.** | : | **IN OPPOSITION TO** |
| | : | **DEFENDANT'S MOTION FOR** |
| **Defendant.** | : | **SUMMARY JUDGMENT** |
| | : | |

I.    INTRODUCTION

Plaintiff Eric Wright ("Wright") brought this action for race discrimination arising out of

his employment with and termination from Defendant Hobsons, Inc. ("Hobsons"). Wright was

the first African-American salesperson in the history of Hobsons and the only African-American

on Hobsons' fifteen member sales force. He performed so well that in 2001 he was nominated

for Salesperson of the Year. Then, on February 1, 2002, Hobsons terminated his employment

ostensibly for poor performance. The statistical evidence shows that Hobsons held a bias against

African-Americans; the circumstantial evidence shows that Wright outperformed several of his

white co-workers who were never disciplined, warned or terminated for conduct similar to

Wright's nor for sales performance that was worse than Wright's. Thus, Wright has sufficient

evidence to establish that Hobson's discriminated against him unlawfully on account of his race

in violation of Title VII of the Civil Rights Act of 1964, as amended (Count I), 42 U.S.C. §1981

(Count II), O.R.C. §4112 (Count III) and Ohio public policy (Count IV).

Following Wright's termination February 2002, Hobsons completed a sale of which

Wright was the procuring cause. Hobsons failed to pay Wright the commission that was due him

on the sale.  Under Ohio law, Hobsons' failure to pay constitutes a breach of contract that entitles

Wright to judgment (Count V).  Consequently, this Court should deny Defendant's Motion for

Summary Judgment in its entirety.

II.    FACTS

Plaintiff Eric Wright is an African-American.  (Exhibit 1)[1]  Hobsons is a company made

up almost exclusively of whites.  (Sorg, pp. 32-33)[2]  While Wright was employed at Hobsons, all

of its executives and upper management were white:  Sean Grant, Scott Winhusen, Greg

Heldman, Norm Goldrich, Chris Sapita, Ben Contra and Gina Sorg.  (Contra, pp. 13-14) (Sorg,

pp. 32-33)  In addition, all of the salespeople besides Wright were white:  DiMario, Korse,

Hanisian, Zahumensky, Bond, Wintringer, Pacella, Sullivan, Cronin, Gruber, Surrey, Payne,

Kampinga, and Warren.  (Exhibit 2) (Sorg, p 33).  In fact, <u>Wright was the first Black salesperson</u>

<u>ever hired by Hobsons</u>.  (Sorg, p. 33)  In all, only 3 or 4 of the more than 50 employees of

Hobsons were Black during the two years Wright was employed there.  (Sorg, pp. 32-33)

Even before he was hired, Wright received closer scrutiny from Hobsons than did his

white counterparts.  Wright and his fellow salesperson, Chris Zahumensky, were both hired in

January 2000.  (Zahumensky, p.6) (Exhibit 1)  Zahumensky, whose only work experience was

selling HVAC systems for one and a half years, was interviewed by just one person.

(Zahumensky, pp. 7, 9-10)  Wright, who had ten years of successful sales experience, had to

interview on separate occassions with Ben Contra and Sean Grant, Hobsons's President.

(Wright, p. 33-34)  Surrey, who was hired in directly as an Account Manager in November 2000,

was interviewed by only one person.  (Surrey, pp. 7 and 47)  Surrey's only experience was in

sports marketing.  (Surrey, pp. 7-8)

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

---

[1] All exhibits are authenticated through deposition testimony.
[2] Citations to deposition transcripts are in made in the form (Witness Name, p. __).  All depositions are filed.

Wright was hired as an Account Manager and was assigned to the CORE TEAM. The CORE TEAM was responsible for selling computer CD's, websites, brochures and other recruiting tools to colleges and universities. (Wright, p. ) For the fiscal year 2001,[3] there were four CORE TEAM salespersons including Wright, each with his or her own geographic area in North America. The others were Darrin Surrey, Chris Kahumensky and Carolyn Sullivan. Joe Payne headed a sales team assigned to Latin America.

At the beginning of FY 2002, Sullivan was promoted off the CORE TEAM and Matt Hanisian replaced her. (Exhibit 1) (Hanisian, p. 11) He was already a salesperson for Hobsons, and Contra did not afford him any "grace period" time when he joined the CORE TEAM. He was expected to perform fully right from the beginning. (Hanisian, pp. 35-36) The CORE TEAM members and Joe Payne's Latin America sales group all sold the same products, had the same office support and reported to Ben Contra, the manager of the CORE TEAM. Contractually, Wright and the other sales persons had contracted to receive a combination of salary and commission as compensation for their sales efforts. (Exhibits 4, 5 and 6) Although the CORE TEAM salespeople had different geographic territories, they were similarly situated in all relevant respects.

Wright's commissions were to be 4% on new business, 2% on renewal business and 1% on duplication business. (Exhibit, p. 4) While the sales persons were not promised a specific duration of employment, they were promised to be treated fairly. (Sorg, p. 10-11)

Wright was a hard worker, and he excelled immediately. (Surrey, p. 37) (Hanisian, p. 26) (Exhibit 7) Matt Summer had been assigned the Northeast Territory before Wright, the only difference being that New York State was removed from the territory when it was assigned to Wright. For the full sales year just before Wright took over the territory, FY 1999, Summer sold

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

---

[3]  Hobsons fiscal year runs from October 1 through September 30.

$215,610 worth of product. (Exhibit 8) Even though Wright had missed the most attractive

selling months (October through December) and he was not allowed to sell in New York State,

he made sales of $253,492 in just seven months.[4] For the next fiscal year, Contra increased

Wright's sales goal to $1,010,000, an increase of nearly $700,000 over the total actual sales

combined for Wright and Summer from the territory the year before. (Exhibit 9) This was the

largest increase of a sales goal of any of the Account Managers for Fiscal Year 2001. (Id.) By

comparison, despite the promise of fair treatment to all, Contra raised Zahumensky's sales target

by only $440,200 above his actual sales the year before. (Exhibits 7 and 9)

Throughout his very successful selling period, the closer scrutiny Wright had experienced

during the hiring process continued. For example, Wright received a written warning for using

his company credit card to make a single personal purchase. (Wright, p. 41) (Exhibit 10) In

contrast, his white peers Darrin Surrey and Matt Hanisian both used their company credit cards

for personal purchases but were never warned or disciplined in writing. (Surrey, p. 30-32)

(Hanisian, p. 23-24) Similarly, Wright received a written warning for using his company cell

phone (at no additional cost to the company) for personal phone calls. (Wright, p.38-40)

(Exhibit 11) His white peers, Zahumensky, Surrey and Hanisian, all made personal phone calls,

too, but were never warned or disciplined in writing. (Surrey, p. 24-25) (Hanisian, p. 24)

(Zahumensky, p. 24)

Wright was discriminated against in more subtle ways as well. For instance, Contra took

the white members of the CORE TEAM golfing, but never extended an invitation to Wright.

(Contra, p. 149)

Despite the huge increase in his sales target for FY2001, Wright performed superbly. He

was one of three people to be nominated for Salesperson of the Year. (Exhibit 12) In Wright's

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

---

[4] Defendant's sales records are missing the year end report for Fiscal Year 2000. Plaintiff made

Fiscal Year 2001 performance appraisal, his manager wrote:

> Eric had a very successful year. He's flirted with achieving his overall revenue number but will have a slight shortfall by years end. Eric produced the most overall revenue for the team achieving over $900K. . . . Eric was a team player and very enthusiastic throughout the year. He had a positive approach toward his client and was always willing to lend a hand when needed.

(Exhibit 13). At the time, he was in line for a promotion to Senior Account Manager. (Id.)

Although his sales total of $889,972, represented a "shortfall" (88% of his sales target), his

percentage of actual revenues against his target was the second highest of all 15 salespersons.

His sales revenue was third highest among all 15 salespersons. Below is a chart showing the

Fiscal Year 2001 performances of just the five salespeople under Contra's management.

|  | SALES TOTALS | PERECNTAGE OF TARGET |
|---|---|---|
| WRIGHT | $889,972 | 88% |
| KAHUMENSKY | $671,234 | 118% |
| SULLIVAN | $891,941 | 66% |
| SURREY | $284,619 | 63% |
| PAYNE | $385,689 | 36% |

(Exhibit 9) While Sullivan outsold Wright slightly, her total represented only 66% of her sales

target. Surrey sold only 63% of his sales target and trailed Wright by $605,353 in actual sales.

Payne sold only 36% of his sales target for the entire year. Sullivan, Surrey and Payne were not

warned or disciplined for their low percentage against target. Instead, Sullivan was promoted

and Payne was excused for an 18-month slump without warning or disciplining him for it.

(Surrey, p. 44) (Contra, p. 18) (Exhibit 15)

In less than two full sales years, Wright raised the revenues for the Northeast Territory from $215,210 to $889,972!  Contra "rewarded" Wright by raising his Fiscal Year 2002 sales target still higher, to $1,395,000, representing a 57% increase above his FY2001 actual sales and almost 700% above the territory he had inherited two years before.

On September 11, 2001, the attack on the World Trade Center in New York City and the Pentagon near Washington, D.C. occurred and disrupted the ordinary comings and goings of Americans, especially in the eastern United States.  (Judicial notice requested)  Contra's standard for Wright did not fluctuate despite the upheaval brought about by September 11 attacks.  In the wake of the attack, Wright experienced a three month slump in sales revenues.  (Exhibit 2)

On January 9, 2002, Contra issued Wright a memo characterizing his performance as unsatisfactory and threatening that his employment would be terminated if he did not meet certain goals during January 2002.  (Exhibit 16)  The criticisms were unfair, essentially when Wright's performance was compared to his white counterparts.  The primary criticisms Contra had of Wright were these:  (1) Wright, on his days in the home office, was not making enough phone calls to potential customers each day, (2) Wright was not traveling to make enough face-to-face sales presentations to customers and (3) Wright's sales were too low relative to his sales target.  (Id.)  Even though business was down and Wright was focused on landing the very large Arcadia sale, Contra set a sales goal for January of $175,000, not counting any sale to Arcadia. This was not reasonably attainable by Wright or any salesperson.  (Exhibit 16)

Contra's criticism of Wright's phone call volume was discriminatory.  Specifically, Contra never threatened the white salespeople in the same manner over their phone call volume, despite the fact that they made far fewer telephone calls than Wright during the same period of time.  (Surrey, p. 20-22) (Hanisian, p. 25) (Zahumensky, p. 23)  The phone records show that Wright averaged at least 466 telephone calls per month during the October – January 2000

period.[5] (Exhibit 17) Hanisian averaged fewer than 200 calls per month; Kahumensky averaged only 332 calls per month. (Id.) In December 2001, the month before Contra told Wright he would be fired if his call volume did not meet minimum levels, Wright made more calls than any of the other CORE TEAM members, 180 more calls than Zahumensky. (Id.) During the four month period in question, Wright made more customer phone calls than all of the other CORE TEAM salespeople. Below is a chart summarizing the number of telephone calls each CORE Team member made during the period October 2001 through January 2002.

| Months/Salesperson | WRIGHT | HANISIAN | SURREY | ZAHUMENSKY |
|---|---|---|---|---|
| | | | | |
| OCTOBER | 265 | 185 | 379 | 282 |
| NOVEMBER | 554 | 130 | 635 | 418 |
| DECEMBER | 393 | 304 | 336 | 213 |
| JANUARY | 654 | 179 | 277 | 415 |
| | | | | |
| TOTALS | 1866 | 798 | 1627 | 1328 |

(Exhibit 17) While under his "January 9 Warning," Wright made at least 654 calls, an amazing 475 more calls than Hanisian made during the same time period and 239 more than the next closest salesperson. (Id.) Wright was fired; Hanisian was not even warned. (Hanisian, p. 51)

Similarly, Wright was criticized for not making enough face-to-face sales presentations to potential customers. However, the cell phone records of the CORE TEAM members show that

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

---

[5] Hobson's phone records are incomplete because the tracking system went down from time to time. Therefore, not all of the phone calls are recorded. However, comparisons between account managers are still meaningful because

Wright averaged the most travel time during the October 2001-January 2002 time period.
(Exhibit 18)  Travel time is the best, objective indicator of the number of face-to-face meetings
each sales person had.  During that time, Wright and Hanisian each traveled 24 days,
Kahumensky 20, and Surrey 17.  (Id.)  None of the white salespeople were warned or disciplined
for not traveling enough.  (Surrey, p. 30) (Hanisian, p. 21-22)

Even Contra's reaction to Wright's three month sales slump between October and
December 2001 was discriminatory.  Examples of the disparity abound.  During his "slump,"
Wright still managed to sell $208,312 of product, which was 44% of his sales total.  Wright's
performance was clearly a slump in light of his highly successful 2001 Fiscal Year.  In contrast,
Joe Payne, coming off an entire year that saw him sell only 36% of his sales target, sold only
57% of his target for the October through December time period.  (Exhibit 9)   While Wright
was fired, Contra excused Payne's "18 months sales slump in [Latin America]" where he did not
"adjust his strategy and find new business" and did not follow up sales campaigns "as
aggressively as I would have liked to see."  (Exhibit 15)  Payne was never so much as threatened
in writing for poor sales performance.  (Payne, p. 25)  Just as Wright was being terminated,
Hanisian began a three month slump -- from February through April 2002 -- where he sold only
$92,437 of product representing 27% of his sales total.  (Exhibit 2)  It was never even so much as
mentioned to Hanisian that his monthly sales numbers were disappointing.  (Hanisian, p. 35)  At
the same time, February and March of 2002, Surrey experienced a two month slump where he
sold only $85,239 representing just 36% of his sales target.  (Exhibit 2)  Surrey was never
threatened in writing with his termination either.  (Surrey, p. 44)

Contra testified that he never determined which of his CORE TEAM salespersons was
the worst.  (Contra, p. 44-48)  To this day, Contra is unable to rank his CORE TEAM

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

when the system was down it failed to record the phone calls for all of the account managers.  Similarly, we can say

salespersons relative to each other with regard to performance. (Id.) Contra testified that he is incapable of saying now which of the salespersons performed the worst during the period of time he was threatening and terminating Wright. (Id.) Instead, he compared Wright to his own expectations for Wright (Id.), expectations that were unfairly higher than those he had for the white salespersons.

Shortly after Wright was terminated, Hobsons completed a large sale to Arcadia that Wright had worked extensively to procure. (Contra, p. 107-109) (Exhibit 2) Hobsons did not pay Wright any commission on the sale even though he was a procuring cause of the sale. (Id.) Hobsons had confirmed Wright's entitlement to such a commission in the letter it issued to him at the time of his termination. (Exhibit 19)

III.     ARGUMENT

A.     Summary Judgment Standard

This Court succinctly stated the standard for granting summary judgment in <u>Mumaw v. Dollar General Corp.</u>, 19 F. Supp. 2d 786 (S.D. Ohio 1998):

> Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed. 202 (1986). Summary judgment is appropriate, however, if the

with confidence that Wright made at least the phone calls recorded by the system.

> opposing party fails to make a showing sufficient to establish the
> existence of an element essential to that party's case and on which
> that party will bear the burden of proof at trial. <u>Celotex Corp. v.</u>
> <u>Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Mumaw, 19 F. Supp. 2d at 790.

      B.     Eric Wright has sufficient evidence to establish his prima facie case of racial
discrimination

          1.     The analytical framework for race discrimination cases set forth
originally in <u>McDonnell-Douglas Corp. v. Green</u> still applies

Wright's claims for race discrimination in employment under federal law (Counts I and

II) and state law (Count III) require the same elements of proof. <u>Weberg v. Franks</u>, 229 F.3d 514

(6th Cir. 2000); <u>Plumbers & Steamfitters Joint Apprenticeship Comm. v. OCRC</u>, 66 Ohio St. 2d

192, 421 N.E.2d 128.

In order to prove his case for race discrimination in employment, Wright must establish

the following four elements: (1) he is a member of a protected class; (2) he was qualified for the

job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person

outside the protected class or treated differently than similarly situated non-protected employees.

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>Talley v. Bravo Pitino Restaurant</u>, 61

F.3d 1241, 1246 (6th Cir. 1995). A person discharged in a reduction in force, the fourth prong

can be satisfied by showing through direct, circumstantial and/or statistical evidence that he was

terminated on account of his race. <u>Barnes v. Gencorp, Inc.</u>, 896 F.2d 1457 (6th Cir) <u>cert. denied</u>,

498 U.S. 878 (1990). Once Wright has established the prima facie case, Hobsons must articulate

a non-discriminatory reason for firing him. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450

U.S. 248, 254 (1981). If Hobsons meets its burden, then Wright needs only to present evidence

sufficient to show that the articulated reasons are a pretext. <u>St. Mary's Honor Center v. Hicks</u>,

509 U.S. 502 (1993).

2.    Hobsons Does Not Dispute the First and Third Prongs of the Prima Facie Case

It is undisputed that Eric Wright is an African American and that he suffered an adverse employment action when Hobsons terminated his employment in February 2002. Therefore, the first and third prongs of the prima facie case are satisfied.

3.    Wright was qualified for his position of Account Manager

Hobsons disputes that Wright was qualified for his position because, it claims, he was not meeting its legitimate expectations with regard to performance. Hobsons's evidence that Wright was not "qualified" is the same evidence that it asserts in support of its reasons for firing Wright. Such reasons, as a matter of law, are not sufficient to defeat the "qualified" prong of the prima facie case. Therefore, Wright was qualified for his position.

At this stage of the prima facie case analysis, Hobsons must show evidence other than that related to the reasons for Wright's firing in order to prove he was not qualified to perform his job:

> When assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason "produced" by the defense as its reason for terminating plaintiff.

Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-661 (6th Cir. 2000).

> "Qualified . . . means objectively qualified, such as proper training, credentials, etc. . . If the plaintiff here can be found "not qualified" for the position, then most plaintiffs in discrimination cases will be barred from pursuing their claims before ever getting to the employer's conduct. The claim will be decided at the threshold level because the employer can simply state that the plaintiff is "not meeting expectations" and pile up a myriad of small infractions to demonstrate the employee's failings. As the prima facie case is not intended to be burdensome, searching analysis at this stage on whether a plaintiff is "qualified" is improper."

McCrory v. Kraft Food Ingredients, 98 F.3d 1342 (6th Cir. 1996) (unpublished).

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

This Court must avoid doing what Hobsons has asked it to do, which is to consider its proffered reasons for discharging Wright at the prima facie stage of the analysis. This is precisely the evidence that is impermissible to prove he was not qualified. The Court of Appeals for the Sixth Circuit has recently and directly instructed district courts not to do what Hobsons requests. Cicero v. Borg-Warner Automotive, Inc., 280 F.3d 579, 585 (6th Cir. 2002) ("Instead of using the discharge justification to judge whether Cicero was qualified at the prima facie stage, the Court should only consider the employer's proffered reason in the later stages of the McDonnell Douglas analysis.") In Cicero, the employer proffered poor performance as the reason why Cicero was not qualified for his position as Human Resources Manager. This was the same reason the employer proffered for terminating Cicero's employment. The Sixth Circuit held that the district court committed reversible error when it considered these reasons in determining whether Cicero met the second prong of the prima facie case. Instead, the Sixth Circuit pointed to Cicero's years of experience in the same or similar positions and concluded that he satisfied the second prong. Id.

Here, like the plaintiff in Cicero, Wright was clearly qualified for his position. No more proof is needed than a mere four months before his termination he completed a sales year for which he was one of three nominees for "Sales Person of the Year." But there is more. He was college educated with ten years of relevant experience in sales. He had raised the sales in his territory from $215,210 to $889,972 in less than two years, and, in his most recent evaluation, his supervisor expressed that Wright was enthusiastic, good with customers and ready to assume a leadership role among the sales team. Wright certainly had all of the skills and credentials necessary to perform well as a salesperson for Hobsons. Therefore, he was qualified for his position, and he has satisfied the second prong of the prima facie case.

3.  Wright was replaced by a white person and he has circumstantial and statistical evidence to show he was singled out for harsher treatment on account of his race

Just before Wright was fired, Hobsons sold CORE TEAM products to both North and Latin America. Four salespeople covered North America: Zahumensky, Surrey, Hanisian and Wright. When Wright was terminated, Hobsons abandoned its Latin American market and consolidated its CORE TEAM products to North America. Payne ceased to have any of his responsibilities for Latin America. Just as it had before Wright's termination, the CORE TEAM in North America still consisted of four members, but they were Zahumensky, Surrey, Hanisian and Payne. While some of the territories were modified slightly, the only material change to the CORE TEAM in North America was the replacement of Wright with Payne. Hobsons cannot avoid the fact that Payne replaced Wright on the CORE TEAM merely by shuffling the sales territories. Because Payne is white and he replaced Wright, Wright has satisfied the fourth prong of the prima facie case.

Wright also has circumstantial evidence that he was singled out by Hobsons for harsher treatment on account of his race. One persuasive type of circumstantial evidence is that that which shows similarly situated white employees were treated better than the African-American plaintiff. Employees do not need to be identically situated to be similarly situated:

> The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly- situated;" rather, as this court has held in *Pierce,* the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects." *Pierce,* 40 F.3d at 802 (emphasis added).

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344 (1998).

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

Hobsons argues that Wright cannot as a matter of law compare himself to the white salespersons at Hobsons. (Motion for Summary Judgment, p. 15-17) Hobsons argument is that Wright was not similarly situated to his peers on the CORE TEAM because he was held to different, higher standard of performance. (Id.) Hobsons suggests, therefore, that there are no comparable employees with which to compare Wright precisely because it treated Wright differently than all of the other salespeople, all of whom were white. Hobsons is actually defending the discrimination charge by admitting to discrimination. Whether Wright was held to a higher standard than his white peers is the fundamental factual issue in this case. By admitting it, Defendant precludes summary judgment.

Moreover, Wright was the same as his peers on the CORE TEAM with respect to all relevant factors: the products they sold, the resources and support they were provided, and their manager. While Hobsons may have been justified in expecting better results from Wright given his experience and territory, those superior characteristics were supposedly reflected in Wright's sales targets. Therefore, assuming for the moment that there was no bias involved in setting the sales targets, the salespersons should be comparable based upon their performance in relation to their targets. While Wright was terminated ostensibly for experiencing a three-month sales "slump," his white peers who experienced worse sales slumps were not. As noted above, Hanisian, Surrey and Payne each experienced a slump as severe as Wright's, all within close temporal proximity to Wright's slump. But, they were not terminated, warned or threatened about their job security.

The higher expectations that Contra held for Wright -- that he make more phone calls, more visits and a higher percentage against his sales target -- were discriminatory expectations. Hobsons actually attempts to defend its discriminatory expectations of Wright by admitting to them and claiming that the differing standards preclude comparison under <u>Ercegovich</u>. Without

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

14

the comparison, Wright is prevented from presenting his most compelling evidence way of proving discriminatory treatment: showing similarly situated whites were treated better than Wright. If Wright was held to a higher standard than his white peers, then he was discriminated against on account of his race. The disparity in standards certainly cannot be a defense to the discrimination. If so, then no discrimination plaintiff could ever reasonably expect to succeed without direct evidence. Every employer would be free to defend itself with impunity by claiming it simply held the minority employee to a higher standard which he did not meet.

With regard to Payne, Contra testified that he judged each of his sales people against their sales targets, which was a reflection of his expectation of the salesperson. (Contra, p. 42-44) Although Payne had some supervisory responsibility over other sales people, his sales target reflected that. Contra expected Payne to supervise his assistants and make his sales target. Therefore, Payne's pitiful performance against goal in FY 2001 of 36%, can be compared to Wright's performance of 44% against goal in the three month period before he was put on "last warning." Payne was not criticized or disciplined; Wright was terminated. This disparate treatment satisfies the fourth prong of the prima facie case.

Surrey, Hanisian and Zahumensky were fellow CORE TEAM members with Wright during the same period of time relevant to this case. As shown above, each of these people were deficient in their performance in the same ways that Wright was perceived to be deficient. They were not even criticized or warned about their performance; Wright was terminated. This is strong evidence that Contra held a bias that worked against Wright on account of his race.

Other circumstantial evidence exists to show disparate treatment on account of his race. Starting right from his first contact with Hobsons, Wright was subjected to closer scrutiny than his fellow white salespersons. He had to undergo a more rigorous interviewing process to get his job and he was criticized when they were not for making personal phone calls and using the

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

company credit card for a personal purchase. Ultimately, he was placed on "last warning" status based upon his rate of calls, number of customer visits and sales totals at a time when his rate of calls and customer visits was higher than his white peers who were not threatened at all. These facts constitute circumstantial evidence that tends to indicate that Hobsons singled out Wright for harsher treatment on account of his race. Therefore, Wright has presented sufficient evidence to support the fourth prong of his prima facie case.

Even though the circumstantial evidence is sufficient on its own, Wright can also present statistical evidence that tends to show that Hobsons held a bias against African Americans. Amazingly, Wright was the first African-American salesperson in the history of Hobsons. At the time Wright worked for Hobsons, he was the only Black among the fifteen salespersons. And only four of the fifty-three total employees were Black. Not coincidently, Hobsons entire upper management was white and had always been so. Therefore, Wright has presented sufficient evidence to indicate that Hobsons singled him out for harsher treatment on account of his race.

    4.    Wright has sufficient evidence to establish that Hobsons articulated reasons for his discharge are a pretext for race discrimination

Wright does not concede that Hobsons has articulated a non-discriminatory reason for his discharge. In fact, as discussed above, the articulated reason is directly discriminatory. Hobsons admits that it held Wright to a higher standard than it held its white salespeople to. This is discriminatory. Therefore, because Hobsons has not articulated a non-discriminatory reason for Wright's discharge, summary judgment against Wright is not appropriate.

Even if Hobsons' reason for discharging was non-discriminatory, it was pretextual. To prove an articulated reason is a pretext, Wright need only present evidence sufficient to establish one of the following:

    (1) that the proffered reasons had no basis *in fact,*

> (2) that the proffered reasons did not *actually* motivate [the
> employment action], or
>
> (3) that they were *insufficient* to motivate [the employment action].

<u>Manzer v. Diamond Shamrock Chem Co.</u>, 29 F.3d 1078, 1084 (6th Cir. 1994) (alteration in

original), citing, <u>McNabola v. Chi. Transit Auth.</u>, 10 F.3d 501, 513 (7th Cir. 1993).

     Evidence abounds that the reasons articulated by Hobsons for Wright's termination were

insufficient to motivate termination. Most directly, none of his white peers who demonstrated

the same or lower performance levels were ever written up for unsatisfactory performance.

Wright made more phone calls, more customer visits and more sales than his peers who were not

discharged (or even warned). His sales slump was no worse than those experienced by his white

peers at or about the same time; yet Wright was fired and his peers were not. If a low number of

sales calls coupled with a sales slump were enough to motivate a discharge, then Hanisian and

Surrey would have been discharged too. Because they were not discharged, or even warned for

poor performance, the reasons must not have truly been sufficient to motivate Hobsons to

terminate Wright's performance. Because Hanisian's, Surrey's and Paynes's continued

employment are strong evidence that the reasons given for Wright's termination were

insufficient to motivate his termination, Wright has demonstrated that Hobsons's articulated

reasons are a pretext. In addition, Contra cannot say that Wright was any worse than the white

salespersons. (Contra, pp. 42-44) If Wright was no worse than the other salespersons when he

was fired, something other than performance must have motivated his discharge. Thus, Wright

can show that the reasons did not really motivate his discharge. Either way, Wright has

demonstrated that Hobsons's articulated reasons for his discharge were a pretext and summary

judgment is inappropriate.

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

5.    Hobsons' same actor inference is very weak under the facts of this case

Hobsons attempts to defend its conduct by asserting the inference that because Ben Contra hired Wright, it is unlikely that he would discriminate against him with regard to his termination. This is referred to as the same actor inference. While the Sixth Circuit recognizes the same actor inference, the inference is not mandatory, especially under the circumstances present in this case. Phelps v. Jones Plastics & Engineering Co., 20 Fed. Appx. 352 (6th Cir. 2001) 2001 WL 1136054. In Phelps, the Sixth Circuit noted it "qualifies the strength of the inference according to the period of time between the hiring and firing or the promotion and firing of an employee by the same person." Id. In this case, the same actor inference is particularly weak because (1) Contra, who fired Wright, was not the only person involved in hiring him; (2) there was more than two years between Wright's hiring and discharge; and (3) Contra demonstrated in many ways, including the hiring process, that he gave Wright closer scrutiny than he gave to his white salespersons. Far from tending to show there was no bias against African-Americans when Wright was hired, these facts show that Wright overcame a bias that existed at the time of his hiring. Therefore, the same actor inference should not be applied in this case.

C.    Wright Has Sufficient Evidence to Support His Claim for Wrongful Termination In Contravention of Ohio Public Policy

The elements of a claim for wrongful termination in contravention of Ohio public policy are (1) a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element); (3) the plaintiff's dismissal was motivated by conduct

BARRON PECK BENNIE & KATZ
1400 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202-3618
(513) 721-1350

related to the public policy (the *causation* element)and (4) the employer lacked overriding

legitimate business justification for the dismissal (the *overriding justification* element).  Collins

v. Rizkana, 73 Ohio St. 3d 65, 652 N.E.2d 653 (1995).  The first two elements are questions of

law for the Court, the second two elements are questions of fact for the jury.  Id.

Ohio has a clearly manifested policy against racial discrimination.  The Fourteenth and

Fifteenth Amendments to the United States Constitution; O.R.C. §§ 4112.01 et seq. (prohibiting

race discrimination in employment), 4111.17 (prohibiting race discrimination in wage rates),

2313.47 (prohibiting race discrimination in the selection of jurors), 2927.03 (prohibiting race

discrimination in housing), 3905.55 (prohibiting race discrimination in insurance agent fees),

5104.09 (prohibiting race discrimination in day care enrollment); 42 U.S.C. §2000e et seq.; 42

U.S.C. §1981 et seq. among others.

Dismissing Wright on account of his race would most certainly jeopardize the public

policy against race discrimination, especially the public policy against race discrimination in

employment.  Wright's evidence of the causal connection between his race and his termination is

set forth above and need not be duplicated here.  Likewise, there is strong evidence that Hobsons

business interest in terminating Wright was merely a pretext for its racially biased motivation.

Therefore, there is at least an issue of fact for the jury as to whether Hobsons had a legitimate

overriding business reason for its action.

Because Wright can establish each of the elements of his claims for wrongful termination

against public policy, summary judgment is inappropriate.

D.    Wright Has Sufficient Evidence to Support His Claim For Breach Of Contract

Plaintiff's employment agreement with Hobsons provided that he would be paid 4%

commission on all new sales and 2% commission on all renewed sales.  The intent of both parties

was that Wright would be paid a commission on sales that were closed within 60 days of his termination. Hobsons assented to this arrangement. When the employer assents, the sales person is entitled to a commission on sales after his separation form the company. Weiper v. W. A. Hill & Assoc., 104 Ohio App. 3d 250, 259, 661 N.E.2d 796, 802 (Hamilton Co. 1995). Hobsons failed to pay him his commission on the sale to Arcadia University, which was closed within 60 days of February 1, 2002. Therefore, summary judgment on Wright's claim for breach of contract is inappropriate.

IV.    CONCLUSION

There are material disputes of fact, or the inferences to be drawn from the facts, that preclude summary judgment in this case. Therefore, this Court should deny Defendant's Motion for Summary Judgment.

Peter A. Burr, Esq. (0040973)
Barron Peck Bennie & Katz Co., LPA
1400 Fourth & Vine Tower
Cincinnati, OH 45202
(513) 721-1350

Ira M. Berman, Esq. (0008636)
415 Glensprings Drive
Suite 102
Cincinnati, OH 45202
(513) 674-1112

Attorneys for Plaintiff

<u>Certificate of Service</u>

I hereby certify that a copy of the foregoing Plaintiff's Memorandum in Opposition to

Defendant's Motion for Summary Judgment was served by ordinary U.S. Mail on Michael E.

Maundrell, Esq., Schroeder Maundrell Barbiere & Powers, 11935 Mason Road, Suite 110,

Cincinnati, Ohio 45249, this 5th day of September 2003.

Peter A. Burr