IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Eric Wright | : |
| | : Case No. C-1-02-508 |
| Plaintiff | : |
| | : District Judge Susan J. Dlott |
| v. | : |
| | : ORDER DENYING |
| Hobsons, Inc. | : DEFENDANT'S MOTION FOR |
| | : SUMMARY JUDGMENT |
| Defendant | : |

This matter comes before the Court on Defendant's Motion for Summary Judgment. (Doc. #12.) Plaintiff Eric Wright seeks legal and equitable relief against Defendant Hobsons, Inc. ("Hobsons"). He claims that Hobsons terminated his employment in violation of federal and state law proscribing race discrimination. He also claims that Defendant is liable for breach of contract since it has not reimbursed him for commissions earned on sales that he procured but that did not close until after his termination. For the reasons set forth below, Defendant's motion is **DENIED**.

I.      FACTUAL BACKGROUND

Defendant Hobsons hired Plaintiff Eric Wright, who is black, to begin employment as an account manager on the Core Product Sales Team ("Core") in January of 2000. Plaintiff was the first black salesperson on the Core team. During the 2001 fiscal year[1] ("FY") the Core team

---

[1] Hobsons tracks its fiscal year from October 1 through September 30.

consisted of four salespeople: Carolyn Sullivan, Darin Surrey, Christopher Zahumensky, and Plaintiff. Sullivan, Surrey, and Zahumensky are white. All Core members sold the same line of products, had the same office support, and reported directly to Benjamin Contra Jr., the manager of the Core team. All Core team members were compensated through a combined system of salary and commission. Plaintiff was responsible for the Northeast territory. Plaintiff and his predecessor on the Core sales team sold a combined total of $317,842 for FY 2000. (Doc. #14, exh. 7.) Plaintiff's sales target goal was raised to $1,010,000 for FY 2001. (Id., exh. 9.) Plaintiff achieved 88% of his FY 2001 target, selling $889,972 worth of products. Plaintiff was nominated for Hobsons' salesperson of the year.

In September, Mr. Contra set new sales target goals for Plaintiff and his three fellow Core team salesmen. The composition of the Core team had changed slightly for FY 2002. The Core team now included Plaintiff, Darin Surrey, Matthew Hanisian, and Christopher Zahumensky. Surrey, Hanisian, and Zahumensky are white. Mr. Contra set Plaintiff's sales target goal for FY 2002 at $1,395,000. According to Mr. Wright, the terrorist attacks of September 11, 2001 severely disrupted his business, given that his territory consisted of the northeastern United States. His sales performance subsequently underwent a slump. (Doc. #14 at 6.) There was no consequential downward adjustment of Wright's target sales goal. On January 9, 2002, Mr. Contra informed Plaintiff by letter that Plaintiff's sales performance was unsatisfactory. Mr. Contra outlined a list of ten specific goals and warned Plaintiff that if the goals were not met by the end of the month, Plaintiff's employment could be terminated. These goals included a minimum number of daily phone calls to clients and a minimum sales target of $175,000, excluding a large deal Mr. Wright was working on. (Contra depo., exh. 4.) Although

all account managers had telephone goals set by Mr Contra,[2] the white account managers were never reprimanded in writing, nor were they told that if they did not make a minimum number of calls their jobs would be in jeopardy. (Zahumensky depo. at 23; Surrey depo. at 20; Hanisian depo. at 25.) Plaintiff also received written warnings in other areas where his white fellow team members did not. Although the three white Core team members admitted to making personal phone calls with their company phone (Hanisian depo. at 24; Zahumensky depo. at 24; Surrey depo. at 25), and two admitted to making personal purchases with their company credit card (Hanisian depo. at 23; Surrey depo. at 32), none of them received warnings or written reprimands, although Eric Wright did (doc. #14, exhs. 11, 12).

On January 28, 2002, Mr. Contra sent Mr. Wright an e-mail stating that the goals delineated on January 9 had not been fulfilled and that Mr. Wright had "one week left to turn-it-around." (Contra depo., exh. 5.) Three days later, on February 1, 2002, Plaintiff was terminated. (Wright depo., exh. 40.) Beginning in February 2002, Joseph Payne, a white male who had been primarily responsible for selling Hobsons' products in Latin America, moved to the Core team, becoming responsible for selling Core products on the West Coast. (Contra depo. at 138-39.) The other territories were shifted so that between the four salespeople, Messrs. Surrey, Hanisian, Zahumensky, and Payne, all territories were covered, including the northeastern territory for which Plaintiff had been responsible.

---

[2]  Mr. Contra states that Mr. Hanisian also had a telephone call goal, although Mr. Hanisian states that he did not. (See Contra depo., exh. 17; cf. Hanisian depo. at 25.)

1.  **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). On those issues for which it shoulders the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted). For those issues on which the moving party will not have the burden of proof at trial, the movant must "point[] out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Although "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient" to overcome a summary judgment motion, Anderson, 477 U.S. at 252, a court should not grant summary judgment merely because the nonmovant's case appears weak. The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

### III.    ANALYSIS

#### A.    Race Discrimination Claims

Mr. Wright seeks to prove his claim of race discrimination by circumstantial evidence; he does not claim that he has any direct evidence that Hobsons terminated him because of his race. To prove race discrimination by circumstantial evidence, Mr. Wright must first establish a prima facie case of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The McDonnell Douglas framework is the evidentiary formula for Wright's Title VII claim, his claim of race discrimination under Ohio Revised Code § 4112, his state law claim for

termination in violation of public policy,[3] and his claim under 42 U.S.C. § 1981.[4] See Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992); Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n, 421 N.E.2d 128 (Ohio 1981).[5]  If Mr.

---

[3] To state a claim of wrongful discharge in violation of public policy, a plaintiff must allege facts showing that his discharge contravened a clear public policy. See Painter v. Graley, 639 N.E.2d 51, 56 (1994). Clear public policy may derive from statutes, the Ohio and Federal Constitutions, administrative rules and regulations, and the common law. Id. Collins v. Rizkana, 652 N.E.2d 653, 657-58 (Ohio 1995) set out the elements a plaintiff must show on a wrongful discharge in violation of public policy claim: (1) that [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) that the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

[4] Hobsons claims that Plaintiff cannot prevail on his § 1981 claims because he did not have an employment contract. The Sixth Circuit has not addressed this issue, although a number of other circuits have. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The Supreme Court took a narrow view of the phrase "make and enforce contracts" in Patterson v. McLean Credit Union, holding that it meant § 1981's protections extended only to the formation of a contract and not to conduct occurring after the contract was made. 491 U.S. 164, 176-77 (1989). Congress responded by passing the Civil Rights Act of 1991, which overruled Patterson by providing a broad definition of the phrase "make and enforce contracts," a definition that included "the making, performance, modification, and termination of contracts." 42 U.S.C. § 1981(b).  This court therefore will follow the Second, Fourth, Fifth, Seventh, Eighth, and Tenth Circuits in holding that an at-will employee discharged for racially discriminatory reasons may maintain a § 1981 claim. See Walker v. Abbott Labs., 340 F.3d 471 (7th Cir. 2003); Skinner v. Maritz, Inc., 253 F.3d 337 (8th Cir. 2001); Lauture v. Int'l Bus Machs. Corp., 216 F.3d 258 (2d Cir. 2000); Spriggs v. Diamond Auto Glass, 165 F.3d 1015 (4th Cir. 1999); Perry v. Woodward, 199 F.3d 1126 (10th Cir. 1999); Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc., 160 F.3d 1048 (5th Cir. 1998).

[5] Because "Ohio courts examine Title VII . . . and state employment-discrimination claims under federal case law interpreting Title VII," Bucher v. Sibcy Cline, Inc., 738 N.E.2d 435, 442 (Ohio Ct. App. 2000), and because Mr. Wright's public policy tort depends on a finding that Hobsons discriminated against him on account of his race, Plaintiff's state law race discrimination and termination in violation of public policy causes of action stand or fall with the federal one. Therefore, the Court need analyze only Plaintiff's Title VII claim.

Wright does establish a prima facie case of race discrimination, the burden of production shifts to Hobsons to articulate a legitimate, nondiscriminatory reason for terminating him.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993).  If Hobsons meets this burden, then Mr. Wright must show that Hobsons' articulated reason is merely a pretext for illegal discrimination and that race was the true reason for the employment decision.  Id. at 508. "Pretext may be shown 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1082 (6th Cir. 1994) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). Thus, though the burden of production shifts in this analysis, the burden of persuasion remains with the Plaintiff at all times.  See St. Mary's Honor Ctr., 509 U.S. at 507; Developments in the Law–Employment Discrimination: Shifting Burdens of Proof in Employment Discrimination Litigation, 109 Harv. L. Rev. 1579 (1996).

      To establish a prima facie case of race discrimination, Plaintiff must show (1) that he belongs to a racial minority; (2) that he was qualified for his job; (3) that, despite his qualifications, he suffered an adverse employment action; and (4) that, after his termination, he was replaced by a member of a non-protected group.  McDonnell Douglas, 411 U.S. at 802; Talley v. Bravo Pitino Restaurant, 61 F.3d 1241, 1246 (6th Cir. 1995).  The fourth prong of the McDonnell Douglas analysis may also be proven by Plaintiff's showing that "a comparable non-protected person was treated better."  Mitchell, 964 F.2d at 582-83 (internal citations omitted). Hobsons does not dispute that Mr. Wright is black nor that he was terminated, and that he can therefore meet the first and third elements of a prima facie case; Hobsons instead contends that Mr. Wright cannot meet the second and fourth elements of the McDonnell Douglas framework.

7

Hobsons argues that Plaintiff cannot show that he was qualified for his job because he did not meet his employer's "legitimate expectations" since his sales performance had undisputedly declined. The Sixth Circuit has recently clarified that in considering at the prima facie stage whether a Plaintiff is qualified for the relevant job, "a court should focus on a plaintiff's <u>objective</u> qualifications . . . " <u>Wexler v. White's Fine Furniture</u>, 317 F.3d 564, 575 (6th Cir. 2003) (emphasis in original). Specific job qualifications will differ depending on the job, but "the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." <u>Id.</u> at 576. Here, Mr. Wright completed a bachelor's degree with a minor in marketing. He had twelve years of sales and marketing experience in the relevant industry at the time Hobsons terminated him, and, further, had been nominated for salesperson of the year for FY 2001 and had achieved one of the highest numbers of actual sales at Hobsons for FY 2001. (Contra depo., exh. 2.) Given Mr. Wright's education, extensive experience, and past success at the company that terminated him, this Court finds that Mr. Wright has met the second prong of the <u>McDonnell Douglas</u> framework and shown that he was qualified for the job in question.

Hobsons also contends that Mr. Wright cannot meet the fourth requirement of the <u>McDonnell Douglas</u> prima facie case because he cannot prove that he was replaced by a member of a non-protected group or that a comparable non-protected person was treated better. Mr. Wright asserts that he was replaced on the Core team by Joe Payne (Wright depo. at 15.), a white employee of Hobsons, who, prior to Mr. Wright's termination, was primarily responsible for Hobsons' sales in Latin America. (Contra depo. at 140.) After Mr. Wright's termination, Mr. Payne's employment "shifted focus completely" from Latin America to the West Coast. (Payne depo. at 15.) Mr. Payne sold Core team products throughout the West Coast, and completely

assumed responsibility for the West Coast market except for a deal in Nevada that a coworker was tying up. (Id. at 17.) As Mr. Payne took responsibility for the West Coast market, the other territories were reassigned, dividing Mr. Wright's former territory among the three other Core team members. (Id. at 15-17.) Mr. Payne termed his change in employment status as "starting out from scratch." (Contra depo., exh. 14, bates # 1204.)[6]

Hobsons asserts that Plaintiff was not replaced by Mr. Payne because Mr. Payne still retained some responsibilities for the Latin American market. (Contra depo. at 141.) Hobsons cites to Brune v. BASF Corp., 41 F. Supp. 2d 768 (S.D. Ohio 1999), rev'd on other grounds for the proposition that "in a [reduction in force], a terminated employee is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work" (internal citations omitted). However, Mr. Wright has set forth sufficient evidence to show that Mr. Payne replaced him and did not merely assume additional responsibilities. In the "Manager Comments" section of Mr. Payne's April, 2002 employment appraisal, Mr. Contra comments that Mr. Payne "was able to take on a new role within the core sales team that started in February 2002" and "Joe has been very adaptable and flexible in the transition from [Latin America] to core." (Contra depo., exh. 14, bates #1206.) Further, any remaining responsibilities Mr. Payne retained in regards to sales in Latin America were greatly decreased since he no longer managed a team for the Latin American market (id. at bates # 1204) and since Hobsons' involvement in

---

[6] In answering the question "Since your last appraisal (or since you joined) how has your job changed?" on his 4/2002 employment appraisal, Mr. Payne assessed his job change: "I am now reporting to a new boss and am working in a new team, with new products and with a whole new marketplace." He acknowledged that he no longer had management responsibility in Latin America and was now solely responsible for his own sales targets and his own performance. (Contra depo., exh. 14, bates # 1204.)

the Latin American market dwindled solely to renewal business "without investing more time and effort into that market." (Contra depo. at 143.)  Finally, Mr. Contra considered shifting Mr. Payne directly into Mr. Wright's former position but chose not to because it "made better sense" to have "brought Joe Payne in from the Latin America market and move[] him over to cover some of the West Coast, . . . shift[] the territories, and then Joe would handle the West Coast." (Id. at 139.)  From the evidence, a reasonable juror could find that Joe Payne replaced Eric Wright.

Alternatively, Mr. Wright could meet the fourth prong of the McDonnell Douglas framework by proving that a comparable non-protected person was treated better.  Hobsons does not contest that the at the beginning of FY 2002, the Core team consisted of four members: Wright, Surrey, Hanisian and Zahumensky.  (Doc. # 15 at 8.)  Mr. Wright is black and the other three Core team members are white.  Mr. Wright's employment was terminated and the other three white Core team members retained their employment.  In order to show that Surrey, Hanisian and Zahumensky are "comparable" to himself, Mr. Wright must show that they are similarly situated to him in all relevant respects.  Ercegovich v. Goodyear Tire & Rubber Co., 254 F.3d 344, 352-53 (6th Cir. 1998).  Factors that tend to show that employees are similarly situated in relevant respects include but are not limited to reporting to the same supervisor, being evaluated under the same standards, and engaging in the same conduct.  Id.  Wright, Surrey, Hanisian, and Zahumensky were all members of the Core team at the beginning of FY 2002.  All Core team members reported to Mr. Contra (Contra depo. at 13), had their sales territories set by Mr. Contra (id. at 16), had a clear directive as to their market and clients (id.), sold the Core team product line (id.), received final approval of their sales target numbers from Mr. Contra (id.), were responsible for at least a minimum number of telephone calls (id. at 63) and face-to-face

appointments (id. at 68), were responsible for attending twice-monthly Core team meetings (id. at 70), and were evaluated by Mr. Contra against the same criteria (id. at 25, 78).  As Mr. Wright was terminated and the three white members of the Core team were not, Mr. Wright has set forth sufficient evidence from which a reasonable jury could conclude that a comparable non-protected person was treated better.

      Having established that Mr. Wright can meet the requirements of a prima facie case, the burden of production shifts to Hobsons to articulate a legitimate, non-discriminatory reason for terminating Mr. Wright.  Hobsons has done so, citing Mr. Wright's poor sales performance in the first quarter of FY 2002.  At the end of the first quarter of FY 2002, Plaintiff had achieved the lowest percentage of his sales target goal of the four members of the Core team.  (Contra depo., exh. 3.)  Additionally, Mr. Contra notified Mr. Wright on January 9, 2002, twenty-two days prior to Mr. Wright's termination, of Mr. Contra's disappointment with Mr. Wright's performance and listed ten goals for Plaintiff to meet with the warning that if Plaintiff did not meet the goals by the end of the month, his employment at Hobson's "may be terminated."  (Contra depo., exh. 4.)  On January 28, 2002, Mr. Contra sent Mr. Wright an e-mail stating that the goals delineated on January 9 had not been fulfilled and that Mr. Wright had "one week left to turn-it-around." (Contra depo., exh. 5.)  Three days later, Plaintiff was terminated.  (Wright depo., exh. 40.)  Mr. Wright's insufficient generation of revenue and his inability to generate that revenue after being told that he had to or face the possibility of termination constitute a legitimate, nondiscriminatory reason for his termination.

      Since Hobsons has met its burden in bringing a legitimate nondiscriminatory reason for Mr. Wright's termination, the burden shifts to Mr. Wright to show that Hobsons' articulated reason is merely a pretext for illegal discrimination and that race was the true reason for the

employment decision. St. Mary's Honor Ctr., 509 U.S. at 508. "Pretext may be shown 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Manzer, 29 F.3d at 1082 (quoting Burdine, 450 U.S. at 256). Mr. Wright can refute Hobsons' legitimate nondiscriminatory reason for his termination "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Wexler, 317 F.3d at 576 (quoting Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000)) (internal citations omitted).

Hobsons proffers the "business judgment" defense to show that its articulated reason for terminating Plaintiff was not pretextual. (Doc. #15 at 16.) Hobsons cites to Brune, 41 F. Supp. 2d at 774 for the proposition that a Court may not "pass judgment on the soundness of an employer's business decision." In Wexler, the Sixth Circuit clarified that an employer's business judgment does not serve as an absolute defense to unlawful discrimination. Wexler, 317 F.3d at 576. Wexler instead instructs that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." Id. (citing Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998)). Wright has produced evidence that tends to show that Hobsons' stated reason that Mr. Wright's poor performance led to his termination did not actually motivate the termination. Although Hobsons states that his poor first quarter sales performance caused his termination, Mr. Wright has produced evidence that tends to show that Hobsons had decided to fire him after only two months of FY 2002, at a time when he ranked third on the Core team in actual sales, and after a month during which he outsold all but one of

his fellow Core team members in actual sales. (Contra depo., exh. 3.)[7]

Additionally, Mr. Wright has brought forth evidence that tends to show that his job performance was insufficient to warrant the challenged conduct.. Plaintiff was given a written reprimand for his lack of client phone calls and told his job "may" be in jeopardy if he did not meet the minimum number of calls, but the three white Core team members were never given written reprimands concerning client calls, nor was their job security ever threatened should they not meet the minimum. The evidence shows that Hobsons thought termination was "obvious" after seeing two months of Plaintiff's low sales figures (46%) (Contra depo., exh. 3) and issued him a list of ten goals to complete or his job would be in jeopardy after seeing three months of Plaintiff's sales (44%). (Id.) March, April, and May are comparable to October, November, and December in terms of sales traffic. (Zahumensky depo. at 37.) Mr. Hanisian sold only 36% of his sales target from March of 2002 to June of 2002 (id.), a time period when he picked up some of Mr. Wright's territory (Hanisian depo. at 30), a territory that, according to Hobsons, was the richest territory. (Contra depo. at 100.) Hanisian never received even an oral reprimand from Mr. Contra (Hanisian depo. at 35), let alone a letter outlining ten goals that he had to meet

---

[7] Hobsons asserts that Plaintiff's poor performance in the first four months of FY 2002 (October, November and December of 2001 and January of 2002) is the reason for his termination. (Doc. #12 at 19). Mr. Contra testified, however, that the last time he discussed Mr. Wright's termination with Hobsons President Sean Grant was in mid-December 2001 (Contra depo. at 87-88). Contra testified that he had talked to Mr. Grant about terminating Mr. Wright prior to the mid-December 2001 discussion, although he was not sure when, and that at that time "it appeared obvious to both [Mr. Grant] and I that [termination] was the course of action that needed to be taken." (Id. at 84). When Mr. Wright's direct supervisor and the company president agreed that Mr. Wright's termination was the "obvious" course of action to be taken, sales figured were completed only for October and November of 2001. In November of 2001 Mr. Wright had cumulatively outsold Mr. Surrey in actual sales, though not in terms of target sales, and had outsold both Mr. Surrey and Mr. Hanisian in actual sales for the month of November.

in order to keep his job.  From the evidence Plaintiff has produced, a reasonable jury could find that Hobsons' stated reason for Plaintiff's termination November 19, 2003 is pretextual.  Thus, Defendant's motion for summary judgment on Plaintiff's federal and state discrimination claims and state wrongful discharge in violation of public policy claim must be **DENIED**.

      **B.**      **Breach of Contract Claim**

Neither party disputes that Mr. Wright was an at-will employee of Hobsons.  Plaintiff bases his breach of contract claim on the allegation that he was the procuring cause of sales that Hobsons completed after his termination, for which he did not receive his promised commission.  Plaintiff was to receive 4% commission on new business contracts and 2% commission on the second and third year of any multi-year contract.  (Wright depo., exh. 17.)  Upon termination, Hobsons informed Mr. Wright that if his pending Arcadia deal was completed within sixty days of his termination, Mr. Wright would receive a 2% commission for non-duplication and a 1% commission for duplication. (Wright depo., exh. 40.)  The evidence is not clear as to whether the Arcadia deal concluded within sixty days of Mr. Wright's termination, nor as to what commission classification the deal fell under.  Taking the evidence in the light most favorable to the nonmoving party, the Court is unable to find that no reasonable jury could find for the Plaintiff.  Defendant's motion for summary judgment must therefore be **DENIED**.

IV.	CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (doc. #12) is hereby **DENIED**.

IT IS SO ORDERED.


                    ___s/Susan J. Dlott_____
                    Susan J. Dlott
                    United States District Judge